T. HICKOX v. THE STATE.

No. 7227. Decided April 11, 1923.

Rehearing granted June 27, 1923.

1.—Murder—Special Term—District Court.

Appellant's complaints of the manner of the calling of the special term of the District Court, at which he was indicted, and of the formation of the grand jury, present matters that in one form or another have often been before this court and decided adversely to his contentions, and there is no reversible error.

**2.—Same—Self-Defense—Charge of Court.**

Where, upon trial of murder, the evidence did not raise the issue of self-defense against the attempted execution of threats by deceased, there was no error in the court's failure to charge thereon.

**3.—Same—Bill of Exception—Practice on Appeal.**

The exceptions to the court's charge have all been carefully considered, and none of them are deemed of such character as that the matters pointed out were erroneous.

**4.—Same—Self-Defense—Defense of Another.**

Where, upon trial of murder, the trial court submitted the law of the right of defendant to defend against danger, real or apparent, to his son, there was no reversible error.

**5.—Same—Evidence—Carrying a Pistol—Cross-Examination.**

Where defendant went to the place where the killing occurred armed with a pistol, saying that he was carrying it not for deceased but another who had made threats against him, the State was within its rights in cross-examining the defendant on the matter of such threats, and the question of remoteness was not an issue, but the inquiry was directed at a present matter claimed by defendant to furnish a reason for having such pistol.

**6.—Same—Evidence—Bill of Exceptions—Practice on Appeal.**

Where it was urged that this cause should be reversed because the attorney cross-examining defendant asked him if his entire record of shooting was not in the back, to which defendant replied that he did not know that he had a record, to which an objection was sustained, there was no reversible error; besides the bill of exceptions was defective.

**7.—Same—Evidence—Bill of Exceptions.**

Where there was a complete lack of any showing in the bill of exceptions of any facts supporting the theory of injury to defendant in either of the matters mentioned, the same cannot be considered.

**8.—Same—Evidence—Acts of Third Parties—Motive.**

Where complaint was made of the fact that a certain State witness testified on direct examination that he had a conversation with deceased, and then was asked if after said conversation he and deceased went anywhere, to which he answered affirmatively, and that they went to the west end of the building to get some water, that defendant was not present, there was no reversible error.

**9.—Same—Instructions to the Jury—Non-Separation.**

The fact that in his general instructions to the jury at the beginning of the trial, among other things, the trial court told them that they must remain together and that if they separated the defendant could reverse the case, and all this occurred before any evidence was introduced, while improper, was not reversible error.

**10.—Same—Form of Verdicts—Charge of Court.**

Where, after reading to the jury the charge of the court, he submitted five forms of verdict, including not guilty, and guilty of murder, etc., telling them to fill out that form which agreed with their verdict, while not good practice, was not reversible error.

**11.—Same—Requested Charges.**

Where a number of requested charges were asked, some of which were given and those refused did not present error, there was no reversible error.

**12.—Same—Argument of Counsel.**

Where the State's Counsel in his closing argument stated that the result of the killing would leave a widow and an unborn child without a father, and it was not shown that these facts were not in evidence, there was no reversible error.

**13.—Same—Argument of Counsel.**

Where the closing argument of State's counsel was that he had had a great deal of experience in trying theft cases, that the defendants would get up evidence in order to escape, which evidently had reference to the attitude of defendant's son as a witness, there is no reversible error.

**14.—Same—Evidence—Argument of Counsel.**

Where a witness for the defense testified that the body of the deceased was carried across the street from where the killing occurrd, and that he saw a boy take a pistol out of the leg of one of the boots of deceased and go away with it, which was controverted by the State's testimony, and the State's counsel in his argument said that the boots of the deceased were offered in evidence, and he challenged the defense to let the jury take them into the jury room if they wished, and test these boots as to whether a pistol could be placed in them when the trousers were in the boots as described by the witness, there was no reversible error.

**15.—Same—Requested Charge.**

Where the requested charge was not applicable or responsive to the argument actually made by the State's counsel, the same was correctly refused.

**16.—Same—Motion for a New Trial.**

Where many matters were set up in the motion for a new trial, regarding which no testimony was heard and which was controverted by the State, this court will not review the acts of the trial court in the absence of a showing of an abuse of his discretion.

**17.—Same—Rehearing—Grand Jury—Challenges—Special Term.**

Where appellant asserted that a judgment against him should be reversed simply because he was denied an opportunity to challenge the array of the grand jury in the absence of a ground therefor, the contention is untenable and there is no reversible error.

**18.—Same—Undisclosed Motive of Deceased.**

The words or acts of the deceased, showing an innocent intention or motive which is undisclosed to accused, are wrongfully permitted in evidence when they in any way impinge upon the defendant's right of self-defense, but under the facts in the record this rule has not in any way been violated in admitting the testimony of the witness Nevell, that he and deceased had gone to the faucet to get a drink of water a short time before the difficulty occurred and expresses no such motive.

**19.—Same—Conduct of Spectators—Influencing Jury—Reversible Error.**

Where, in the instant case. the State produced no evidence controverting the truth of the allegation in defendant's motion for a new trial as to what

occurred during the course of the trial while evidence was being introduced, relative to applause of the spectators, nor as to that occurring during the argument of counsel representing the State, and it appeared therefrom that defendant had not received a fair and impartial trial, judgment must be reversed and the cause remanded; and this without reference to the acts of resentment of the widow of the deceased to some statement of defendant's attorney.

20.—Same—Indictment—Presentment of Indictment.

The statute requires that there shall be entered upon the minutes of the court, when the grand jury returns an indictment, the file number of said indictment with the style of the criminal action, omitting the name of defendant, unless he is in custody or under bond, but does not require that the offense shall be named, but where such entry showed simply the name of the offense and omits entirely those things requisite to the identification of the indictment, the same is reversible error, although a dismissal is not ordered in this case, and the matter is left to the District Court for such steps as are necessary to be taken.

Appeal from the District Court of Tom Green. Tried below before the Honorable C. E. Dubois.

Appeal from a conviction of murder; penalty, imprisonment for life.

The opinion states the case.

*W. A. Anderson,* and *Snodgrass & Dibrell,* for appellant. On question of entry of indictment, Hardy v. State, 1 Texas Crim. App., 556; Denton v. State, 3 id. 635; Cox v. State 7 id., 495; Rowett v. State, 23 id., 197; Massie v. State, 107 S. W. Rep., 847.

On the question of undisclosed motive of deceased, Brumley v. State, 21 Texas Crim. App., 222; Johnson v. State, 148 S. W. Rep., 328; Spannell v. State 203 id., 357; Standifer v. State, 212 id., 958.

On question of mob law and demonstration by spectators, Bullington v. State, 180 S. W. Rep., 681; Stanchel v. State, 231 id., 120; Thomas v. State, 204 id., 999.

*R. G. Storey,* Assistant Attorney General, for the State.

LATTIMORE, Judge.—Appellant was convicted in the District Court of Tom Green County of murder, and his punishment fixed at confinement in the penitentiary for life.

Appellant's complaint of the manner of the calling of the special term of the District Court of Upton County, at which he was indicted, and of the formation of the grand jury, but present matters that in one form or another have often been before this court and decided adversely to his contentions. The rules governing the convening of regular terms of the courts and the formation of grand jurors in such case, are but the work of the Legislature. No Legislature can so make rules as that a later one may not change them.

The law-makers in 1905 enacted statutes governing the calling of special terms of district courts, the convening of grand juries, the trial of cases, etc., at such special terms and providing for the repeal of all laws inconsistent therewith. Articles 95-97, Chapter 3, Title 2, C. C. P., are part of said act. The judge of the court in such case does not have to give notice and none of the provisions of the general laws relating to convening of District Courts generally, or the formation of grand juries generally, upon which reliance is had by appellant, can avail where same are in necessary conflict with said provisions of the Act of 1905. The decision most relied on by appellant in his brief is a dissenting opinion. The matter has been too often discussed to need more than reference to the cases which present the conclusions of this court about it from almost very angle. Ex parte Young, 49 Texas Crim. Rep. 539; Ex parte Boyd, 50 Texas Crim. Rep. 312; Boyd v. Texas, 209 U. S. 539; McIntosh v. State, 56 Texas Crim. Rep. 134; Mayhew v. State, 69 Texas Crim. Rep., 187, 155 S. W. Rep. 196; Chant v. State, 73 Texas Crim. Rep., 345, 166 S. W. Rep., 514; Wilson v. State, 87 Texas Crim. Rep., 538, 223 S. W. Rep. 217; Ex parte Holland, 91 Texas Crim. Rep., 339, 238 S. W. Rep., 654; Newton v. State, 93 Texas Crim. Rep., 314, 247 S. W. 281.

We have carefully examined the facts in evidence and find nothing in same calling for a charge on the law of self-defense against the attempted execution of threats by deceased. It is shown in testimony that some few days prior to the homicide Jim Hickox, a son of appellant, had, in the night-time, taken a horse under the control of deceased and carried it away from the town of Rankin. The defensive theory about such taking was that it was by mistake and that young Hickox had thought the horse belonged to a friend of his and that he had put a pack upon it and gone some fifteen miles out in the country and there turned the horse loose. It is also in testimony that following this deceased, accompanied by the sheriff, went out to a sheep camp where said Jim Hickox was, looking for the horse, and that when they first accosted him regarding it he denied the taking, but later admitted it and said that he thought the horse belonged to a friend of his. In the course of the conversation young Hickox said to deceased that he would not have done a white man that way and deceased struck him. According to the defense witnesses, on the night of the homicide and prior thereto deceased made some general threats, but clearly same did not refer to appellant or to his son Tom but evidently to Jim Hickox. This appears from the testimony of appellant himself. No special charges were asked presenting any such defensive thory as that under discussion.

The exceptions to the court's charge are lengthy but have all been

95 T. C.—12

carefully considered and none are deemed of such character as that the matters pointed out were erroneous.

There was no dispute of the fact that at the time he was killed, deceased and Tom Hickox, another son of appellant, had hold of each other and were scuffling or struggling across the floor, and Tom testified that deceased was trying to get a pistol, and appellant testified that he heard Tom say to deceased that he must not get that gun. Both deceased and Tom Hickox were young men, and the testimony further showed deceased to be active and muscular. The defense claimed that just before engaging in the struggle with Tom Hickox, deceased had assaulted appellant. The learned trial court submitted the law of the right of appellant to defend against danger, real or apparent, to his son Tom Hickox, and we find nothing in the cases of Brady v. State, 65 S. W. Rep. 522; Hickey v. State, 76 S. W. Rep., 930, or Lyons v. State, 71 Texas Crim. Rep., 183 which either in the facts or upon the law would sustain the contention that it was error in the instant case to charge the jury that if deceased was making or about to make an attack on appellant or his son Tom Hickox which from the manner and character of it, and the relative strength of the parties, and defendant's knowledge of the character and disposition of the deceased, caused him to have a reasonable expectation or fear of death or serious bodily injury to him or his son Tom, and that under such apprehension he did the shooting, they should acquit. We do not think the charge in this regard subject to any exception.

The killing took place at a public dance held in a garage. Appellant went to the place armed with a pistol. On direct examination he asserted that his reason for having said pistol was because he had learned that one Charles Poland had made threats against him. On cross-examination he said that several years before this trouble he had been told of threats made by Poland and also a few weeks before he had heard of same. He admitted that he had seen Poland a number of times and had no difficulty of any kind with him, and that Poland had made no attempt to execute any threats. The State pressed him to know why Poland should threaten him. The stenographic report of the testimony at this point is attached to the bill of exceptions and shows the following:

"Q. What was he threatening your life about?

A. It was in regard to some of his relatives, his father.

Q. What about his father, how was it in regard to his father?

A. It was trouble that his father and myself had had.

Q. What kind of trouble?

A. It was a difficulty in which I had to kill him."

We think the State was within its rights in cross-examining appellant on the matter of such threats. Both he and his son Tom went

to said dance armed with pistols. According to the State's theory appellant had been much angered at deceased following the assault by the latter upon young Jim Hockox growing out of the horse transaction above referred to. It was in testimony that after learning of said difficulty in a conversation with the sheriff, appellant said he did not think the sheriff should have let deceased beat up Jim, and told the sheriff he would learn the sorry son-of-a-bitch how to beat up a boy and that he wanted the sheriff to tell the deceased so. This was just a few days before the homicide, and the State's theory was that appellant and his sons went armed to the place of the dance for the purpose of having a difficulty with deceased. The State's testimony shows that deceased was conducting himself in a quiet, peaceable manner, and that just before the homicide Tom Hickox came up and proceeded to bring up the matter of the assault by deceased upon his brother and grappled with deceased, and at this juncture appellant walked to where the men were struggling and around to the rear of deceased, pulled out his pistol and shot deceased in the back, killing him. In probing the reason for the threats claimed by appellant to have been communicated to him as made by Poland offered in justification of the presence of a pistol had by him, the State asked appellant what kind of trouble he had had with Poland's father and appellant made the statement that "It was a difficulty in which I had to kill him." This answer to the question asked him by the State, can not be held a basis for the objection made. We do not regard this matter as proof on the part of the State of a charge made against appellant at a time too remote to have any legitimate bearing upon any issue in the case. The inquiry was directed at an ascertainment of a present matter claimed by appellant to furnish the reason for his having a pistol on his person on the night of the homicide.

It is also urged that the case should be reversed because the attorney cross-examining appellant asked him if his entire record of shooting was not in the back. Appellant replied that he did not know that he had a record. At this point appellant's attorney objected and the objection was sustained. The question was probably objectionable, but no objection being interposed before the witness answered, and especially inasmuch as the bill contains no showing of facts from which we might be apprised of the fact that appellant in truth had no record as a killer, and showing in some way the injurious character of the question, we would not be inclined to hold the matter of that materially injurious character ascribed to it by appellant.

Bill of exceptions No. 4 presents two objections,—one seemingly to a statement of the attorney for the State,—and one to a question asked witness Kirkpatrick by said attorney which was not answered. Said attorney stated that he did not know there was a

skeleton in the closet; the appellant objected to such statement and the court sustained the objection and instructed the jury not to consider the statement. The bill further shows that at another time during the cross-examination of such witness the attorney for the State asked him if he had a brother named Ben Kilpatrick. The courts sustained objections to this. There is a complete lack of any showing in the bill of any facts supporting the theory of injury to appellant in either of the matters mentioned, Statements of facts appearing in the brief of appellant not supported by anything in the record, can not be considered by us in this connection.

Complaint is made of the fact that State witness Nevell testified on direct examination that he had a conversation with deceased; following which he was asked if after said conversation he and deceased went anywhere, to which he answered, yes; later he was asked where they went after such conversation and replied that they went to the west end of the building to a water faucet to get some water. Appellant was not present. We see nothing in Spannell v. State, 83 Texas Crim. Rep., 418, upon which could be based a claim for the rejection of such testimony.

In his general instructions to the jury at the beginning of the trial, among other things, the learned trial court told them that they must remain together, that if they separated the defendant could reverse the case. This is set up as misconduct of the court. It appears that this occurred before any evidence was introduced. We do not think the statement should have been made but that it was not of that material character for which the case should be reversed. It is also complained that the court gave to the jury, after reading them the charge, five forms of verdicts, including not guilty, and guilty of murder, etc. telling them that when they had come to a decision they would fill out that form which agreed with their verdict. This does not seem succeptible of the construction that it was an intimation on the part of the court that he thought appellant was guilty. We do not think such practice should be commended.

A number of special charges were asked some of which were given. No good purpose would be served by setting out those refused, all of which have been examined and the refusal of none is believed to present error.

By bill of exceptions No. 11 it is shown that an exception was taken to the statement in the closing argument for the State that the result of the killing was to leave a widow and an unborn child without a father. If these facts were in evidence we see no reasonable objection to reference thereto in argument. The bill does not show that said facts were not in testimony.

Bill of exceptions No. 12 complained of the refusal of the court below to instruct the jury to disregard the statement in the closing

argument for the State that the attorney had had a great deal of experience in trying theft cases and usually when you get one dead to rights, they will get up some defense of mistake in order to escape. Evidently this argument had reference to the attitude of the defense witness Jim Hickox. We have already referred to the fact that it was in testimony that said witness had taken a horse from the custody of deceased at night and had carried him away. It was also shown that following the disappearance of said horse deceased and the sheriff went to a sheep camp about twenty-one miles from Rankin, from which place the horse was taken, and that after first denying his having taken said horse, Jim Hickox admitted taking him and said he thought it belonged to a Mexican friend of his, and that if the horse belonged to deceased, he was sorry and would return him; that his taking the horse was a mistake. Substantially these facts were testified to by Jim Hickox, a witness in this case. Under these facts we do not think the argument complained of to be materially prejudicial to this appellant.

The defense produced a witness who said that after the body of deceased was carried across the street from where he was killed, that he saw a boy take a pistol out of the leg of one of the boots of deceased and go away with it. Many other witnesses who were around the body and examined it, said they saw no pistol or weapon of any kind. It was in testimony that when shot deceased was in his shirt sleeves with his pants tucked in his boots. Tom Hickox testified for the defense that as he was struggling with deceased just before appellant shot, deceased was trying to get to his boot-leg. The attorney arguing the case for the State said that the boots of the deceased were offered in evidence and he challenged the defense to let the jury take them into the jury room if they wished, or to bring a man into the court room the size of deceased and let him test these boots as to whether a pistol could be placed in them when the trousers were in the boots as described by the witness. We are unable to conclude this to be prejudicial and unfair argument. An experiment such as indicated in said argument would seem to have been proper if made during the introduction of testimony. We are cited to no authority holding such argument improper.

Bill of exceptions No. 14 shows a requested charge whose refusal was proper, for the reason that such charge was not applicable or responsive to the argument actually made by the State's attorney, as same is set out in the stenographic report thereof attached to said bill.

The unfortunate occurrence forming the basis of this prosecution and conviction was most fully developed, and the trial of appellant presented hotly contested issues. Many matters are set up in the motion for new trial regarding which no testimony was heard by the

trial judge. The State controverted the truth of the allegations in said motion relating to occurrences in the courtroom during the argument of the case. No evidence having been introduced, and the matters having been submitted to the trial judge and passed upon by him, we are not prepared to say that his action was any abuse of his discretion in the matter.

Finding no error in the record, the judgment of the trial court will be affirmed.

*Affirmed.*

### ON REHEARING.

### June 27, 1923.

HAWKINS, Judge.—We think our original opinion upon the manner of calling the special term of court in Upton County, and the formation of the grand jury sufficient without further elaboration save upon one point stressed in the motion for rehearing, viz: that the special term having been called and the grand jury organized without notice to appellant or his attorneys that no opportunity was had to challenge the array of grand jurors or any particular grand juror as provided in Article 409, 412, and 413 of our Code of Criminal Procedure. Without setting them out here, it will be observed that each of Articles 412 and 413 specify the grounds which must exist before the challenge in either case will be available to an accused. If the calling of the special term of court without notice prevented appellant from challenging in limine as required by Article 409 (supra) there exists no doubt in our mind under the authority of Carter v. State, 39 Tex. Cr. Rep., 345, 46 S. W. Rep., 599, that the same objection would have been available 687, 44 L. Ed 839; McCline v. State, 64 Tex. Cr. Rep., 19, 141 S. W. Rep., 977, and Robinson v. State, 92 Texas Crim. Rep., 527, 244 S. W. Rep., 236, 48 S. W. Rep., 508, Id. 177 U. S. 442, 20 Sup. Ct., upon the motion to quash the indictment. But before an injury is shown two things must be made to appear: (a) that the right to challenge, or otherwise object, was denied, and (b) that a ground of challenge existed. For appellant to assert that a judgment against him should be reversed simply because he was denied an opportunity to challenge, if in fact he had no ground therefor, would find no support in reason or law. There being no attempt to show that any ground for objection or challenge to the grand jury as a whole or to any particular member thereof in fact existed, this ground of the motion for rehearing is without merit.

Appellant urgently contendse that we were wrong in not holding erroneous the admission of the statement of the witness Nevell that he and deceased had gone to the faucet to get a drink of water a short time before the difficulty occurred, upon the ground that it

was the expression in the presence of the jury of an innocent motive on the part of deceased of which appellant was unaware, and therefore injurious to him from the standpoint of the defensive issue.  Many authorities are cited by appellant in his brief which announce a correct proposition of law that has long been recognized by this court, that the words or acts of deceased showing an innocent intention or motive but undisclosed to accused are wrongfully permitted in evidence when they in any way impinge upon his right of self-defense.  Under the facts in the record now before us we can not agree that the rule has in any way been violated.  The killing occurred in a garage eighty feet long and forty feet wide.  There was a door in the south side of the building and also in the east and west ends, but none in the north side.  The witness Nevell testified that immediately before the killing he and deceased went from a point about the middle of the north wall to the southwest corner of the garage where the water faucet was situated to get some water.  Neither appellant nor his son (Tom Hickox) was in the building at that time, because they each testified that they afterwards came in at the west door of the garage.  Tom Hickox testified that he came in at said door and was himself going to get a drink of water when he came in contact with deceased and the fight which resulted in deceased's death started.  Appellant testified that he came in at the west door after the fight was in progress.  If either of the Hickoxes had been in the corner of the building near which the water faucet was situated at the time Nevell and deceased started to that portion of the building we can readily understand how the testimony that they were going after water might have been hurtful under appellant's theory of the case; but deceased and the witness having reached the point where the fight started at a time when both the Hickoxes were out of the building we fail to understand in what way it could have injuriously affected appellant's interests.

The twenty third ground of appellant's motion for new trial is based upon the conduct of the spectators in the courthouse which appellant asserts resulted in influencing and prejudicing by public opinion the jury against appellant.  Subdivisions A and B of said twenty third paragraph are as follows:

"(a) That during the introduction of testimony the court house was usually fairly well filled with spectators; that during the introduction of testimony when the State would apparently make a point in its favor in the argument on the admissibility of testimony, at various times scattered through the trial, the audience would cheer; that the court would at each time call upon the audience to refrain from applauding; that on the third or fourth occasion of such applause said applause became so general and noisy in the court room, that the court stated in substance, after rapping

loudly and finally securing quiet so he could be heard, that if the crowd made any further demonstration and did not keep quiet, he would be compelled to clear the court room and put the audience out of the room; that thereafter during the introduction of testimony, there was a slight ripple of applause only once or twice; that nothing was said by the court to the jury regarding same.

"(b) That after the closing of the evidence in the case, F. L. Snodgrass, attorney for the defendant, was making the closing argument for the defendant, said attorney for defendant stated in substance, in referring to the deceased, that the deceased was at the dance comfortably full of bootleg whisky, or some other kind of whisky; whereupon attorney, Thurmond, a private prosecuting attorney, who closed the argument, and who was sitting just behind said Snodgrass at a table, interrupted said Snodgrass, saying in substance, 'There is not a particle of testimony here to show that the deceased had any whisky or had drank a drop of whisky;' whereupon, said Snodgrass stated in substance, 'There is testimony in the record; one witness testified deceased asked him to take a drink with him, and other witnesses testified he was intoxicated. He, therefore, not only was drinking, but had whisky and was inviting other people to drink it.' Thereupon the wife of the deceased, who was sitting behind the railing within the bar some ten or fifteen feet behind said attorney Snodgrass, arose from her seat, and screaming in a loud broken voice, 'It's a lie, it's a lie,' and started in the direction of Snodgrass swinging her arms over her head exclaiming, 'Let me get to that old thing I'll kill him, I'll kill him.' She made a step or two and staggered and parties threw their arms around her and she was assisted out of the court room sobbing and crying. During all this time said Snodgrass was standing before the jury saying nothing waiting for the excitement to subside to resume his argument. The jury was not admonished in any way concerning this matter."

Subdivision C of said paragraph 23 will be condensed by us. Mr. Thurmond, one of the attorneys representing the prosecution, while making the closing argument for the state, used this language:

"Judge Snodgrass related to you that when he was but twenty one years of age he came to Coleman and there he met this defendant, and that he has been his friend ever since then. I became acquainted with this deceased when the people of my community gathered together at the train ——"

At this point he was interrupted by an objection from Judge Snodgrass that there was no evidence authorizing Mr. Thurmond to make the statement he was about to make and challenged his right to do so, whereupon Mr. Thurmond retorted that neither was there testimony in the case authorizing Snodgrass to tell the jury how long he had been acquainted with appellant, to which Mr. Snod-

grass assented; Mr. Thurmond then retorted, "then you are willing to do something before the jury and are unwilling to accord the State the same privilege?"

The motion for new trial further alleges that after this statement from Thurmond the audience applauded "—by stamping their feet, clapping their hands, whistling, yelling and making a terrific noise and demonstration against the defendant, which demonstration was tremendously vociferous and evidenced unmistakably a strong sentiment and prejudice against this defendant."

The motion further recites: "In this connection, F. L. Snodgrass, attorney for defendant, specially states and says that in his thirty-seven years of experience in the practice of law at the bar, this demonstration exceeded by far any he had ever witnessed on any previous occasion, and was equal in noise for the time same lasted to any demonstration he had ever witnessed in any political discussion in any court house in Texas.

"W. A. Anderson specially says he has practiced law for thirty-one years and has participated in the trial of a great many cases, but has never before witnessed such demonstration in the trial of any case of such sentiment and prejudice against a man on trial; that it was more like a demonstration at a ball game or horse race.

"The jury was not admonished in any way concerning said matter."

It is further averred as a part of said paragraph twenty-three that appellant and his attorneys were ignorant of the prejudice manifested by the audience until the same was exhibited during the trial, and alleges that if they had known of the existence of such prejudice they would have applied for a change of venue on the ground of such prejudice. This paragraph of the motion for new trial is supported by the affidavits of F. L. Snodgrass and W. A. Anderson who state upon oath that the allegations in said paragraph are true and correct. The state filed a controversion to this paragraph of the motion but supported it only by the affidavits of the jurors who sat during the trial of the case. They in no way controvert the truthfulness of the matters alleged in that ground of the motion, but in fact their affidavits in effect admit much therein asserted. They claim that the applause on the part of the audience during the closing argument of Mr. Thurmond was not in any way considered by them in arriving at their verdict and had no influence upon them, and that the conduct of the widow of the deceased likewise had no influence upon them. In the controversion filed by the state the court is asked to hear evidence upon the matters asserted. The original order of the court upon the motion is silent upon this point, but a corrected order now appears in a supplemental transcript which shows that the court in fact heard no evidence upon that ground of the motion but acted solely upon the affidavits of the State and appellant. We are now confronted with this condition:

the matter alleged. by appellant as to the misconduct of the audience is supported by the affidavits attached thereto; the truth of this is in no way controverted by the State. We attach little importance to the affidavits of the jurors as to what may or may not have influenced them in arriving at their verdict. A new trial should not be granted because the audience applauded counsel for the State when the demonstration was promptly suppressed by the court. Parker v. State, 33 Tex. Cr. Rep. 111, 21 S. W. Rep., 604, 25 S. W. Rep. 967. But the motion avers that the audience was in no way reprimanded by the court or the applause suppressed incident to Mr. Thurmond's argument, and this assertion is verified by the affidavits referred to. If the audience was only expressing their approval of the speech of their favorite attorney it might well have been mistaken by the jury for a demonstration in favor of the cause he represented and therefore against appellant. Our law never contemplated that a man should be tried for a grave offense involving his life or liberty under circumstances which appears to have existed during the instant trial. In the case of Hamilton v. State, 36 Tex. Cr. Rep., 372 complaint was made that the bystanders applauded the argument of the district attorney. The court explains in that case that when the applause occurred he commanded silence, which was obeyed, and he ordered the sheriff to arrest any parties so offending, and to prevent a repetition; that such applause was principally in the gallery of the court room, and could not, for the moment, be controlled by the court or the sheriff, nor could it be ascertained afterwards who the offending parties were. Commenting upon this state of affairs this court said:

"Such conduct in the trial of a case is certainly very reprehensible, and is calculated to greatly prejudice the rights of a defendant on trial with the jury; and when such conduct occurs it should be the duty of the court to use every means in his power to ascertain the guilty parties, and to visit upon them the severest punishment that the law authorizes; and even then it is doubtful whether such action will withdraw from the jury the effect that may be produced upon them by the plaudits of a mob approving the sentiments announced by the prosecution. Where such conduct does occur, the judge should scan the record very carefully, and if it is probable that the jury were influenced thereby, a new trial should be granted."

In the instant case the State produces no evidence controverting the truth of the allegations as to what occurred during the course of the trial while evidence was being introduced relative to applause of the spectators, nor as to that occurring during the argument of counsel representing the state. If such conduct did not occur as is alleged and verified or if the same has been exaggerated the State should have met the issue either by affidavits or proof. This it has

not done. We are unwilling to permit a conviction to stand under circumstances revealed by the record in this cause. As to the ultimate guilt or innocence of appellant we are not concerned, but only that he have a fair trial. We are persuaded from the record that it is impossible for any man to have received a fair and impartial trial under the circumstances shown. The court should have sharply reprimanded the audience and at least given the jury to understand that such conduct was offensive to the orderly procedure of the trial; if this did not have the desired effect he should have promptly cleared the courtroom of spectators if that was the only way to preserve order; if this could not be accomplished then the defendant should have been promptly granted a new trial. What we have said has reference to the conduct of the public who attended the trial rather than to the regrettable incident produced by resentment of deceased's widow as some statement of the attorney for the defense in his argument, although it is to be hoped this will not occur again.

The prosecution originated in Upton County. Before the order changing the venue was entered and before pleading to the merits of the case, a motion to quash the indictment was filed, on the ground, among others, that there was no sufficient order showing the presentment of the indictment. This part of the motion to quash was overlooked in our original opinion. The minutes of the special term of court were offered supporting this ground of the motion. They show the organization of the grand jury and then proceed as follows:

"— And after being sworn by the court as Grand Jurors and receiving the instructions of the Court touching their duties. as such, retired in care of the proper officer to enter upon their deliberations; then having returned into open court in a body and each member thereof having answered 'present' to his name as the same was called by the Clerk of said Court, presented in open court the following indictment — *Murder* — which was ordered by the Court to be filed. Then reporting no further business before them were discharged by the court."

No offer was made to correct the order of presentment but the same appears in the bill of exception to the court's refusal to quash as hereinbefore set out. Article 446, C. C. P., reads as follows:

"The fact of a presentment of indictment in open court by a grand jury shall be entered upon the minutes of the proceedings of the court, noting briefly the style of the criminal action and the file number of the indictment, but omitting the name of the defendant, unless he is in custody or under bond."

It will be observed that the foregoing Article requires that there shall be entered upon the minutes of the court the file number of the indictment with the style of the criminal action, omitting

the name of defendant unless he is in custody or under bond, but does not require that the offense shall be named. The bill of exception recites that appellant was in jail at the time the indictment was returned against him and there appears to be no reason why the provisions of Article 446 were not carried out even to naming the accused. Prior to 1876 the article in question read as follows:

"The fact of a presentment of an indictment in open court by the grand jury shall be entered upon the minutes of the proceedings of the court, noting briefly the style of the criminal action and the offense charged."

Many authorities will be found construing the article both prior to and since its amendment. Hardy v. State, 1 Tex. Cr. App., 556; Denton v. State, 3 Tex. Cr. App., 635; Cox v. State, 7 Tex. Cr. App., 495; English v. State, 18 Tex. Cr. App., 679; Strong v. State, 18 Tex. Cr. App. 119; Rowett v. State, 23 Tex. Cr. App., 197; Massie v. State, 52 Tex. Cr. Rep., 548, 107 S. W. Rep., 847. Other authorities may be found collated in Vernon's Crim. Stat., Vol. 2, under said Article 446 and in Branch's Ann. Pen. Code under Section 472, page 245. Under the present statute it is not necessary for the minutes of the court to show the offense charged against an accused and it was held in Massie (supra) to be surplusage to do so. It will therefore be seen that so far as the record discloses the only "presentment entry" shows a recital not necessary and omits entirely those things requisite to identification of the indictment as the one returned by the grand jury, viz: the file number of the indictment and the style of the criminal action and in the instant case the name of the defendant could with propriety have been inserted.

We do not review at length the authorities referred to but an examination of them will disclose that the entry in the present case is entirely insufficient. The word "murder" identifies nothing. It could apply to one person or one indictment as well as another; the number and style of the criminal accusation, however, would definitely fix the identity of and presentment of the indictment. Since the above decisions were rendered construing the article in question the actual language of the statute has been re-enacted by the Acts of 1879, 1895 and 1911. Notwithstanding the many decisions of this court construing the language of the said Article 446 the Legislature has made no change therein, but in view of them it from time to time has re-enacted the same.

We are not inclined to order a dismissal of the prosecution because of the incomplete "presentment entry" of the indictment in Upton County but believe the cause should be remanded with instructions to the court in Tom Green County to take such steps as may be found necessary under the facts relative to the entry in question. If the entry on the minutes be in fact sufficient, and it

incorrectly appears in the record before us Hollingsworth v. State, 87 Tex. Cr. Rep., 399 will throw some light on the procedure.

For the errors discussed, the motion for rehearing is granted, the judgment of affirmance set aside, and the judgment of the trial court is reversed and the cause remanded.

*Reversed and remanded.*